## FIRST & FARMERS STATE BANK OF GHENT, BY J. N. PEYTON, v. JAMES T. CROSBY AND OTHERS.[1]

May 18, 1934.

No. 29,812.

[1]Reported in 256 N. W. 315.

*Thomas E. Latimer* and *Harold Runstad,* for appellant.

*Fowler, Carlson, Furber & Johnson* and *Ralph H. Comaford,* for respondents.

*HILTON, Justice.*

Action to recover $292.97 for the claimed wrongful conversion by defendants of eight head of young cattle upon which the state bank of Ghent had a mortgage. At the close of the trial to a jury each party moved for a directed verdict. The motions were denied. Plaintiff had a verdict for $182.48. Upon motion of defendants, the court set aside the verdict and ordered judgment in their favor. From that order this appeal was taken.

On May 29, 1931, one Hero Maertens gave to the bank his note for $4,000, due one year from that date, a renewal of a then existing obligation. As security therefor he gave to it a chattel mortgage on 28 head of Hereford cattle, 10 horses, 16 Duroc Jersey sows, 115 spring pigs, 125 chickens, together with the income and increase therefrom; also on 800 bushels of grain and corn, a large quantity of farm machinery, and on all the crops to be raised in 1932 on his own 160-acre farm and three-fifths of the crops on another 160 acres of land that Maertens had rented. The mortgage covered all of Maertens' personal property except a few tools, as did a previous chattel mortgage. The mortgage had the customary provision that in case of default the mortgagee might declare the whole sum due and payable and might take possession of the mortgaged property. It was filed in the office of the register of deeds of the proper county on June 2, 1931. The bank was closed for liquidation and taken

over by Peyton, commissioners of banks, on March 19, 1932. One J. P. Devine was made special examiner in charge of the liquidation. The bank, upon Maertens' default, did not take possession of the property. Maertens, on June 7, 1932, had eight of the mortgaged young cattle transported by truck to South St. Paul, where they were delivered to the pens of defendants, commission men, who sold the same to Armour & Company for $292.97. From that amount defendants deducted their commission and certain other charges and gave to Maertens a check payable to his order for $265.66. Defendants had no actual notice of the mortgage. The amount received is conceded to be the reasonable value of the cattle.

The position of respondents is that the bank through Devine authorized the sale of the cattle and later ratified such sale. Two special interrogatories were submitted to the jury, viz:

"Did Mr. Devine, for the plaintiff, consent to a sale being made by Mr. Maertens of the mortgaged calves in question?

"Did Mr. Devine, for the plaintiff, ratify or affirm the sale after it was made by Mr. Maertens?"

The jury answered each of the questions in the negative and also found a general verdict in favor of plaintiff, as before stated. On this appeal the view of the evidence most favorable to plaintiff must be accepted. However, if the evidence when so considered, together with every inference which may fairly be drawn therefrom in favor of the verdict, is such as to compel as a matter of law an affirmative answer to either or both of the above questions, plaintiff cannot recover.

The only witnesses at the trial were Devine, Maertens, and the truck driver. The latter testified only to his transportation of the calves in question. Maertens testified at first as a witness for plaintiff, later as a witness for defendants. On Devine's own testimony and the uncontradicted testimony of Maertens there must be an affirmance. Devine testified that on or about May 16, 1932, he went to Maertens' place with two members of the depositors' committee; that he then inspected the cattle; that "they were in very good condition; all of Mr. Maertens' cattle have always been in

good condition. They were just getting ready for market when I saw them; he stated he would have to ship them some time soon." Devine made no objections to such a shipment, nor did he make any suggestions or give any directions. He further testified that he knew Maertens was shipping some of the cattle; that he waited until Maertens' return from South St. Paul and then went to the latter's farm and asked him for the check received from the sale of the calves; that it was handed to him; that he asked Maertens to indorse it over to him to apply on the note; that Maertens refused, stating that he would be in to see Devine in a few days; that he handed the check back to Maertens; that a day or two later Maertens came into the bank and handed him (Devine) several receipts representing money paid out by him for necessary expenses in operating the farm, including $100 in wages paid to a hired man; that Maertens also gave him $90, stating that that was all that was left of the proceeds from the sale of the calves; that he (Devine) took the $90, gave Maertens a receipt therefor, credited that amount upon the note, and later sent the receipts to the banking department.

The uncontradicted testimony of Maertens is that soon after Devine took charge of the bank he went in to see him and recited the situation and told him that he could not run the farm alone; that he had to have help and that he had considerable expenses to pay before he could get anything out of the new crop; that he had nothing to finance it with and asked if the banking department would see him through; that Devine said: "Sure, the banking department gave me orders that anybody who was willing to go ahead to do what they ought to do that they would see him through" (a reasonable and laudable attitude for the department to take) ; that at the time he handed the check over to Devine the latter said: "How come that it is in your name and the bank is not included in that? * * * that was mortgaged stuff; the bank is supposed to be included * * * cash it and bring it in to the bank."

Maertens' testimony relative to what took place the day Devine came to his farm for the check is in accord with that of Devine, except that Maertens stated that he told Devine he had to pay the

hired man, a feed bill and a twine bill, and other expenses, and that Devine said, "Pay them." Devine denied that Maertens made those statements or that he (Devine) ever told Maertens he could dispose of the money in any way other than to turn it over to the bank.

From the above it appears conclusively that Devine knew that Maertens was about to ship some of the mortgaged cattle; that he knew on the day of shipment, or shortly thereafter, that they were being shipped; that after the sale his only criticism of the transaction was that the bank had not been made one of the payees in the check; that he had the check for the full amount of the proceeds in his possession and voluntarily returned it without taking any steps to secure the bank's interest therein; that he voluntarily accepted $90 thereof without seeking to recover the balance from Maertens. True, that was all the cash the bank received, but the expenditures made by Maertens were necessary for the care and protection of the property upon which plaintiff had a mortgage. If the check had been indorsed and the bank had received all the money, of course no right of action would have existed. It was not the fault of the defendants that the whole amount was not turned over to the bank. . Under the facts of this case, the liability of defendants was not dependent upon whether all, a part, or any of the proceeds were turned over to plaintiff. It clearly appears that plaintiff intended and expected Maertens to sell the cattle. Defendants cannot be held liable for the failure of Maertens to pay the full amount of the check to the bank, as instructed. It follows that by permitting Maertens to sell the cattle and to receive the proceeds therefrom without making any arrangements for protecting the mortgagee's interest, the mortgagee knowing the cattle were soon to be shipped, there was an implied authorization of the sale, or at least an equitable estoppel from denying such authority and from maintaining this action against defendants, good faith purchasers, for the conversion of the cattle or the proceeds therefrom. Hogan v. Atlantic Elev. Co. 66 Minn. 344, 69 N. W. 1; Partridge v. Minnesota & D. Elev. Co. 75 Minn. 496, 78 N. W. 85; Stockyards Nat. Bank v. B. Harris Wool Co. 316 Mo. 426, 289 S. W. 623; First Nat. B. & T. Co. v. Stock Yards Loan Co. (C. C. A.) 65 F. (2d) 226; Moffett

Bros. & Andrews Comm. Co. v. Kent (Mo. Sup.) 5 S. W. (2d) 395. The lien of the mortgage under the circumstances here was as effectively relinquished as if plaintiff had executed and filed for record a formal written release of the mortgage as to these calves.

From the evidence the conclusion is inescapable that there was also ratification of the sale. It is quite well settled that where a mortgagee accepts part of the proceeds of the sale of the mortgaged property, with knowledge of the transaction, he is estopped as against a good faith purchaser to assert that the sale was invalid. Parker v. Harrell, 188 N. C. 337, 124 S. E. 575; Warrick v. Rasmussen, 112 Neb. 299, 199 N. W. 544; Seymour v. Standard L. S. Comm. Co. 110 Neb. 185, 192 N. W. 398; McCollum v. Wood (Tex. Civ. App.) 33 S. W. 1087. See also Helgeson v. Farmers Co-op. Assn. 160 Minn. 109, 199 N. W. 821; Sloan State Bank v. B. M. Stoddard & Son, 178 Iowa, 104, 159 N. W. 636, L. R. A. 1917A, 1261.

Affirmed.

